**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DARRELL WAYNE MOSS,**

**Plaintiff,**

**v.**                                                    **Civil Action No.: 2:11-cv-44**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**


**REPORT AND RECOMMENDATION THAT CLAIMANT'S MOTION
FOR SUMMARY JUDGMENT BE DENIED AND COMMISSIONER'S
MOTION FOR SUMMARY JUDGMENT BE GRANTED**

**I.  Introduction**

A.      Background

Plaintiff, Darrell Wayne Moss, ("Claimant"), filed his Complaint on June 8, 2011,

seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security ("Commissioner").[1]  Commissioner filed his Answer on

August 29, 2011.[2] On October 3, 2011, Claimant filed his Motion for Summary Judgment.[3] After

being granted two motions for extension of time, Commissioner filed his Motion for Summary

Judgment on December 6, 2011.[4] Claimant filed his Reply on December 15, 2011.[5]

---

[1] Dkt. No. 2.

[2] Dkt. No. 8.

[3] Dkt. No. 11.

[4] Dkt. No. 16.

[5] Dkt. No. 19.

B.    The Pleadings

    1.    Claimant's Motion for Summary Judgment & Memorandum in Support

    2.    Commissioner's Motion for Summary Judgment & Memorandum in Support

C.    Recommendation

I recommend that:

    1.    Claimant's Motion for Summary Judgment be **DENIED** because the ALJ properly considered whether Claimant suffered from an impairment under 1.04A of the Listing of Impairments, properly determined there are jobs in the national economy that Claimant can perform, and properly handled Claimant's claims of obesity and anxiety.

    2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.    Procedural History

 Claimant filed an application for Disability Insurance Benefits on June 4, 2008, alleging disability since September 18, 2005 due to heel, head, neck, lumbar and cervical spine injuries, and anxiety. (Tr. 103, 165). Claimant's initial application for disability benefits as well as his request for reconsideration were denied. On February 13, 2009, Claimant requested a hearing before an ALJ, which occurred on July 6, 2009 in Auburn, Florida. (Tr. 15).

On January 26, 2010, the ALJ issued a decision adverse to Claimant finding that he was not disabled at step five of the sequential evaluation process and he could still perform light work. (Tr. 17-25). Claimant requested review by the Appeals Council but was denied on April 7, 2011. (Tr. 1-3). Claimant filed this action, which proceeded as set forth above, having exhausted

her administrative remedies.

B.    Personal History

Claimant was born on February 1, 1966, and was forty-three years old on the date of the July 6, 2009 hearing before the ALJ. (Tr. 24, 32). Claimant is a high school graduate. (Tr. 32). He received vocational training in drafting and shop classes in high school. (Tr. 64-65). He used to have a carpenter's license and formerly owned a company called Darrell Moss Construction. (Tr. 65, 67). Claimant has prior work experience working at a lawn mowing business (Tr. 32, 120-121) and doing construction work, in particular doing metal stud framing (Tr. 33).

C.    Medical History

On September 19, 2005, Claimant fell ten feet down through a hole in the second floor of a building. (Tr. 212, 218). He landed on his left heel, was taken to Wuesthoff emergency room for treatment, and was told he had suffered a left heel fracture from the fall (Tr. 212, 218). On September 22, 2005, Claimant was treated at the Space Coast Orthopedic Center by Dr. Mani El Kommos, who informed him that he would need surgery on his foot. (Tr. 212). On September 25, 2005, Dr. Vuoung B. Nguyen at Florida Hospital in Orlando, Florida performed an open reduction and internal fixation of the left calcaneus. (Tr. 217). Claimant was then placed on a twenty-pound weight bearing limitation for the first six to eight weeks after surgery. (Tr. 215, 218). On June 13, 2006, Claimant underwent surgery to remove the hardware put in during the last surgery, and he was placed on another twenty-pound weightbearing limitation for another eight to twelve weeks. (Tr. 213-214, 218).

On September 28, 2006, Claimant began treatment with Dr. Christopher J. Prusinski for neck pain that was radiating to the upper extremities bilaterally with numbness and tingling in

certain places. (Tr. 273). He also reported experiencing decreased range of motion and stiffness in his neck, constant lower back pain radiating to the lower extremities and hips bilaterally with left heel and foot pain, mid-back pain radiating to the anterior chest, and suboccipatal to frontal headaches due to photophobia and phonophobia, and difficulty sleeping. (Tr. 273). Dr. Prusinski noted Claimant had diminished sensation to fine touch and pinprick, but position, vibration and parietal cortical senses were intact. (Tr. 275). He also noted a reduction in range of motion in the cervical spine and lumbar region. (Tr. 275). Dr. Prusinski diagnosed Claimant with a closed head injury, traumatic cervical, thoracic, and lumbar sprain as a result of his September 2005 accident, and also ruled out post-traumatic cervical and/or lumbar radiculopathy, uncontrolled hypertension and morbid obesity. (Tr. 275).

On October 9, 2006, Claimant had a cervical MRI performed which showed a left posterior paramedian disc herniation at C6-7 that contacts and deforms the left anterolateral aspect of the cervical spinal cord with a slight decrease in the left neuroforamen and possible impingement on the left C7 nerve root, and a straightening of the normal cervical lordotic curvature. (Tr. 272). Also on October 9, 2006, Claimant had a lumbar spine MRI performed which showed decreased T2 weighted signal at the L4-5 and L5-S1 levels consistent with desiccation and degenerative disc disease. The doctor also noted a minimal posterior disc bulge at L4-5 and L5-S1 without neurological compromise and a  slight straightening of the normal lumbar lordotic curvature. (Tr. 270). Claimant also had a thoracic MRI performed on that date, but it came back normal. (Tr. 271).

October 19, 2006, Claimant went back to Dr. Prusinski with complaints of neck pain, back pain, and knee pain. However, the doctor made no positive findings on examination of his

neck; his mental status examination was normal; and his EMG and nerve conduction studies of his lower extremities were normal. (Tr. 265, 267-269).

On November 2, 2006, Plaintiff saw Dr. Prusinski again with complaints of neck pain with numbness and tingling of the upper extremities. (Tr. 261). His EMG and nerve conduction studies were still found to be normal. (Tr. 261-264).

On November 9, 2006, Plaintiff went to Royal Oaks Medical Center and was given prescriptions for Hydrocodone and Xanax. (Tr. 351). On December 12, 2006, Plaintiff returned to Royal Oaks Medical Center to ask for refills of his pain medications. On December 13, 2006, Dr. Prusinski's examination indicated cervical, thoracic and lumbar paraspinal muscle spasms on palpation. (Tr. 259-260). In January, March, May, and July 2007, Claimant also returned to Royal Oaks Medical Center for medication refills. (Tr. 346-349).

Dr. Prusinski, who had continued to treat Claimant, recommended surgical evaluation of the cervical spine on August 13, 2007. When the evaluation was performed on August 30, 2007, the results showed left C7 radiculopathy with chronic meurogenic changes, renervation and ongoing denervation on the EMG. The results also showed that the thoracic spinal muscles were bilaterally normal. (Tr. 257). Pursuant to the results, Dr. Prusinski also diagnosed Claimant with right and left ulnar neuropraxia, failure of conduction in a nerve in the absence of structural changes. (Tr. 256). Then, on October 11, 2007, Plaintiff reported working a little, and Dr. Prusinski recommended vocational rehabilitation. (Tr. 252). Claimant had a subsequent cervical MRI on September 11, 2007, that confirmed the definite impingement of the C7 nerve root and impingement of the C6 nerve root. (Tr. 253-254). On September 12, 2007 and November 5, 2007, Plaintiff returned to Royal Oaks Medical Center for medication refills. (Tr. 344-345).

On December 29, 2007, Claimant was referred to Dr. Richard A. Hynes at the Back Center in Melbourne, Florida to discuss the possibility of cervical surgery because he had undergone more conservative modalities, like various chiropractic treatments between October 9, 2006 and November 19, 2007, physical therapy, and other medications, but they had not afforded him relief. (Tr. 335). Dr. Hynes diagnosed Claimant with a cervical herniated disc with left clinical radiculopathy and lumbar degenerative disc disease at L4-5 and L5-S1 with a herniated disc and annular tear, although he found no atrophy, loss of motor strength, and he was found to be neurologically well. (Tr. 335). Dr. Hayes recommended that Claimant have a CT discogram to determine the causal etiology of his pain.

On January 7, 2008, Claimant had a discogram, which showed moderate to severe degenerative disc disease at the L4-L5 level and mild to moderate generalized degenerative posterior facet arthropathy, but no evidence of a radial tear at L2-3 or L3-4. (Tr. 324-325). Also on January 7, 2008, Dr. Lily J. Voepel evaluated Claimant at the Back Center. She diagnosed him with a C6-7 herniated disc with radiculopathy, lumbar degenerative disc disease at L4-5 and L5-S1 with bilateral radiculopathy, asthma, hypertension, irregular heartbeat, chest pain, anxiety, kidney stones, migraine, gout, arthritis, and head injury. (Tr. 332). Dr. Voegel also reported that the straight leg raising test, which can detect lumbar nerve root pressure, tension or irritation, was positive and that he has a mild paracervical muscle spasms with a limited range of motion due to neck pain. (Tr. 332). On January 8, 2008, Claimant returned to the Royal Oaks Medical Center for medication refills. (Tr. 343).

On January 15, 2008, Dr. Brooks saw Claimant at the Back Center. Dr. Brooks diagnosed him with neck pain with left upper extremity radiculitis, herniated nucleus pulposus, C6-7, low

back pain with lower extremity pain and degenerative disc disease of the lumbar spine, L4-5 and L5-SI. He also reported that he was working part-time mowing lawns, had no complaints of headaches, was alert, answered questions appropriately, his speech was clear, and he had a pleasant affect. (Tr. 329). On February 12, 2008, Dr. Voepel gave Claimant an epidural injection at the L5-S1 level bilaterally, as well as a C7-T1 interlaminar epidural injection. (Tr. 327-328). Dr. Voegel also noted that the SLR showed Claimant had tightness in his hamstrings.

On April 15, 2008, when Claimant returned to the Back Center and saw Dr. Hynes, he reported a forty percent improvement in his back pain from the injections, but was still concerned with the stenosis and spinal cord injury, subarachnoid narrowing and disc herniation. The doctor noted that Claimant said "he can only work 2 or 3 hours a day then he really hurts, he states, for the next day or two." (Tr. 326).

On September 11, 2008, Claimant went to see Dr. Hynes again and reported reduced range of motion and an inability to stand, sit or walk for long periods of time. (Tr. 358). The doctor reported that his gait was non-antalgic, his range of motion in his lower back and neck were restircted, and that he had a diminished sensation to soft touch and pinprick in his upper extremities with a 4/5 moor testing score, indicating some give due to pain in both tibialis anterior bilaterally and in the biceps. (Tr. 358). Claimant also requested that the office fill out paperwork for social security disability. (Tr. 358).

On September 12, 2008, he returned to the Royal Oaks Medical Center to request that his pain medications be refilled early because he had to go out of town. (Tr. 389). He also reported that he was doing reasonably well. (Tr. 389).

On October 2, 2008 Psychologist Theodore Weber, Psy.D., reviewed Claimant's records

at the request of the State Agency and concluded Claimant does not have a severe mental impairment. (Tr. 369-382). He noted that Claimant has mild restrictions of daily living, mild difficulties in maintaining social function, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 379). On January 27, 2009, he again stated that Claimant does not have a severe mental impairment, and that he has only mild restrictions of daily living, no difficulties in maintaining social function, no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 392-405).

Also on January 27, 2009, Sunita Patel, M.D., reviewed Claimant's records and determined that Claimant is able to lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday and was otherwise not limited in his ability to push and pull. She also determined that Plaintiff could stoop and crouch occasionally. (Tr. 406, 408). On June 23, 2009, Dr. Hynes indicated that Claimant's gait was non-antalgic, that range of motion for his back was restricted, that he had 4/5 motor testing with same give in the tibalis anterior testing, that his upper extremity strength was 5/5, that the SLR was positive at 60 degrees, that give-way on the right was greater than give-way on the left; and that there was no finding of atrophy. (Tr. 429-432). He also wrote that based on his discussion with Claimant, it would be difficult for him to work in even a sedentary capacity. (Tr. 429).

On January 29, 2009, Psychologist Bruce Hertz reviewed Claimant's records at the request of the State Agency and advised that Plaintiff does not have a severe mental impairment and has only mild restrictions of daily living, no difficulties in maintaining social function, no

difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 404).

On June 23, 2009, Dr. Hynes discussed the possibility of a cervical discectomy and fusion with Claimant. However, because he was only under a letter of protection, he did not have the money for a down payment towards the surgery, despite have undergone a preoperative work-up for a cervical fusion and consideration of a lumbar fusion. (Tr. 429). On July 2, 2009, Dr. Voepel conducted a physical restrictions evaluation of Claimant and found that he was limited to four hours of time sitting cumulatively over an eight-hour period; two hours of time standing cumulatively in one eight-hour period; two hours of time walking cumulatively in an eight-hour period; and six hours to time sitting and standing in one average eight-hour period. (Tr. 432).

D.    Testimonial Evidence

Testimony was taken at the hearing held on July 17, 2009. The following portions of the testimony are relevant to the disposition of the case:

Claimant testified about the accident he suffered in 2005. He said that he was on the second floor of a new addition to a building and that he walked right into a hole in the floor. (Tr. 33). When asked how he landed from the fall, he said "I would have had to have landed stiff-legged on my left leg, because it crushed my heel...and messed up my lower back. And the neck injury could have came from the head..." (Tr. 34). He was taken to the emergency room where they told him his foot was broken, put a split on it, and told him to go see another doctor for x-rays within the next few days. (Tr. 34-35). The x-rays revealed his heel was crushed, not just broken, and he had to have surgery on it. (Tr. 34). Then Claimant testified that he had to have a

second surgery on his foot about a year later. (Tr. 34). Claimant testified that even with these surgeries, he still has to use a cane to walk around the yard sometimes. (Tr. 36).

Claimant also testified that after his second foot surgery, he began treatment on his neck and back, which included going to see a chiropractor and a neurologist. (Tr. 37). His also testified that his MRIs showed herniation of one of his discs and that Dr. Voepel performed a discogram. (Tr. 38). He testified that both Dr. Hynes and Dr. Voepel recommended surgery, a discectomy and a fusion to help his neck and low back pain, and that Dr. Voepel gave him steroid injections to help the pain until surgery. (Tr. 38, 39).

Claimant also testified that he has not been able to go back to his construction job since the accident, but that he has done some mowing work since the accident. (Tr. 40). He testified that he never does more than a couple of hours of mowing a day, though. (Tr. 41). He also testified that he cannot mow the largest lawn in the trailer park anymore because he cannot mow for two continuous hours. (Tr. 42).

Claimant also testified about the pain he has in his neck. He said it "[h]urts in my shoulders, goes up on my neck when it turns into a migraine, or, causes a migraine. Radiates down into my shoulder blades, usually worse on my left side than my right. Goes down both arms. It's a, a burning, sharp, sometimes its sharp, sometimes its burning, sometimes it's a dull ache. Goes down into my left hand a lot. Very seldom but sometimes goes into the right hand." (Tr. 43). He testified that without his medications, on a scale of one to ten, his pain level would be a nine, and that even with pain medication, his pain level never goes below a five. (Tr. 43).

Claimant also testified about his manipulative limitations. He stated that he has little dexterity and that because of the numbness in his hand, it "just doesn't do what I'm telling it to

do." (Tr. 45). He also testified that his left leg gives way at times. (Tr. 47). Claimant also testified to the headaches he gets, stating that "[s]ometimes I'll get one four times a week." (Tr. 45). He also testified that he sleeps horribly and cannot lay on a flat surface like a bed on his back.

Claimant also testified about possible psychiatric problems. He stated that he has never been treated formally for psychiatric problems, but that he has talked to his ex-wife's psychologist about his nightmares. (Tr. 48). He testified that he does not think he needs a psychiatrist, but that he needs someone who can help him understand why he keeps having nightmares or what can make them go away. (Tr. 49).

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

Claimant testified about doing basic household tasks. He stated that he cannot put the dishes in the dishwasher himself because he cannot bend over. (Tr. 49). He testified that he also has the same problem putting clothes into the dryer. (Tr. 49). Claimant testified that it hurts his lower back, neck and arms when he attempts to fold clothes. (Tr. 50).

Claimant also testified that he struggles to perform basic tasks related to personal hygiene. He testified that if he has to brush his teeth, he has to put his knees on the cabinet and his elbows on the vanity. (Tr. 51). He testified that if he wants to shave after brushing his teeth, he has to take a break first. (Tr. 51).

He testified that he uses a cane around three times a week if he needs to go walk around

11

in the yard. (Tr. 52). He also testified that he uses a belt on his back for support. (Tr. 52). He also testified that he has a driver's license with a motorcycle endorsement. (Tr. 70).

Claimant testified about his source of income. He stated that in order to get by he borrows money from his family. (Tr. 67-68). He also stated that for two years he was mowing lawns for money, with income of a little over $5,000 the first year and $2,400 the second year.

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant's brief alleges three instances of error on the ALJ's part: 1) that the ALJ's conclusion that Claimant did not suffer from an impairment that meets the Commissioner's Listing of Impairments is not supported by substantial evidence and is based on legal error, 2) that there is not substantial evidence to satisfy the Commissioner's burden of showing that there are jobs in significant numbers in the national economy that Claimant is capable of performing, and 3) that the ALJ failed to properly develop the record concerning Claimant's obesity and anxiety.

Commissioner contends the ALJ's decision is supported by substantial evidence and should therefore be affirmed. Specifically, Commissioner responds that: 1) Claimant has not met his burden of proving that he met a listing, 2) that the ALJ can rely on medical vocational rules to determine the availability of jobs, and 3) none of Claimant's physicians stressed weight loss as a concern and non identified work-related limitations due to Claimant's weight.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.      <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.      <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c)); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe

impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C. Discussion

    1. Whether the ALJ Erred by Failing to Consider Whether Claimant Suffered From an Impairment that Met or Equaled Section 1.04 of the Listing of Impairments

Claimant argues that he suffers from an impairment that meets or equals the Listing of Impairments, entitling him to a finding of disabled. More specifically, Claimant argues evidence shows he suffers from an impairment that meets Section 1.04A of the Listing, which is the section for disorders of the spine.

As a general rule, "for a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). To meet the criteria under §1.04A, the Claimant must have a spine disorder, i.e., spinal stenosis, degenerative disc disease, or others, accompanied by: 1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, 2) limitation of motion of the spine, 3) motor loss (atrophy with associated muscle weakness or muscle weakness), and 4) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). 20 C.F.R. pt. 404, Subpt. P, App. 1., Listing 1.04A. Section 1.00 also sets forth instructions for

evaluating whether a claimant has an impairment or combination of impairments that meets or medically equals the Listing.

In this case, the ALJ found that objective medical evidence of record did "not establish the severity of the claimant's impairments meet the severity criteria required by the Listing of Impairments. In addition, no expert designated by the Commissioner has offered an opinion that the claimant's impairments equal any section of the listed impairments." (Tr. 18). Claimant directs the Court to evidence in the record showing nerve root compression, restricted range of motion, and neuro-anatomic distribution of pain, weakness, and sensory loss. However, this Court's decision must be based on whether there is substantial evidence in the record to support the ALJ's conclusion that he does not meet a listing, not merely whether they may be evidence that supports a different conclusion. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)("We many not reverse the Commissioner's decision merely because substantial evidence exists in the record that would have supported a contrary outcome.").

To the contrary, here there is substantial evidence in the record that supports the ALJ's conclusion that Claimant's impairments did not meet or equal Listing 1.04A. Claimant does not ambulate ineffectively, as described in the Listing; on the contrary, Claimant testified that he is able to walk around the yard (Tr. 52), mow lawns (Tr. 40), and perform basic household functions with some help or modifications. (Tr. 49, 51). Claimant does not use a motor device for ambulatory assistance.

Additionally, the ALJ cites objective medical records in his review of Claimant's medical history indicating that Claimant does not meet the criteria for Listing 1.04A. In September 2006, for example, Dr. Prusinski concluded that Claimant had some reduction in range of motion in the

cervical spine and lumbar spine, but that finger-to-nose, heel-to-knee-to shin and rapid alternating movements were normal. His muscle bulk, tone and strength were also normal with no evidence of atrophy or fasciculation. (Tr. 275). His MRIs from 2006 also show that the cervical spine was normal apart from a left posterior paramedian disc herniation at the C6-7 with slight decrease in the left neural foramen and possible impingement upon the left C7 nerve root and straightening of the normal cervical lordotic curvature. (Tr. 236). The thoracic spine MRI was also normal, and the lumbar spine MRI was normal apart from findings consistent with desiccation and degenerative disc disease at L4-5 and L5-S1, a minimal posterior disc at L4-5 and L5-S1 and slight straightening of the normal lumbar lordotic curvature. (Tr. 238, 239). Dr. Prusinski also noted on October 19, 2006 that his EMG and NCS of the lower extremities were normal, and on November 2, 2006, the EMG and NCS of his upper extremities were normal. (Tr. 261-264). Although on August 30, 2007, the doctor did not evidence of persistent chronic left C7 radiculopathy compared to his prior studies, and that a new MRI showed impingement upon the left C7 and also an increase in degenerative disc disease and spondylotic changes (Tr. 222-223, 236), Claimant was still about to work part-time at that time, and the doctor recommended vocational rehabilitation. .(Tr. 252). On December 29, 2007, Dr. Hynes found that although Claimant had a reduced range of motion due to pain, there was no atrophy, no loss of motor strength, and Claimant was neurologically intact. (Tr. 335). Although the examination performed by Dr. Voepel on January 7, 2008 showed moderate to severe degenerative disc disease at L4-L5 and generalized degenerative posterior facet arthropathy , there was no finding of atrophy and his muscle strength in his lower extremities, his deep tendon reflexes in his patella and ankle and grip were normal. (Tr. 332-334). On January 15, 2008, Dr. Brooks reported that Claimants SLR

was negative and that there was no atrophy. (Tr. 329). On February 15, 2008, Dr. Voepel reported that although Claimant has some tightness in his hamstrings and limited range of motion in his neck, there was no finding of atrophy. (Tr. 328). On April 15, 2008, Claimant was found to have cervical tenderness and restricted range of motion on examination, but Claimant was still working a "quite labor-intensive job," and there was no finding of atrophy. (Tr. 326). Finally, on September 11, 2008, Claimant was noted to have a non-antalgic gait, restricted range of motion in his low back and neck, diminished sensation to soft touch and pinprick in his upper extremities and 4/5 motor testing with some "give way" due to pain, but there was still no atrophy. (Tr. 358).

Accordingly, there is substantial evidence to conclude that Claimant does not meet the criteria of Listing 1.04A. Therefore, there was substantial evidence for the ALJ to find that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

2.      Whether the ALJ Erred in Determining there are Jobs in Significant Numbers in the National Economy Claimant can Perform

Claimant next argues that the Commissioner improperly relied on the Medical Vocational Guidelines to met his burden of proving that there is other work the Claimant can do since Claimant allegedly suffers from limitations that exist in the absence of physical exertion and since Claimant cannot perform a full range of activities in a particular exertional category.

As a general rule, pursuant to 20 C.F.R. §§ 404.1566(e), 416.966(e), an ALJ may rely on vocational expert testimony to help determine whether other work exists in the national economy that Claimant can perform.  In Walker v. Bowen, the Fourth Circuit held that "[t]he purpose of bringing in a vocational expert is to *assist* the ALJ in determining whether there is work

18

available in the national economy which the particular claimant can perform." 889 F.2d 47, 50 (4th Cir. 1989)(emphasis added). See also Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996). Requiring the testimony of a vocational expert is discretionary in most cases. Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981). Claimant is correct in asserting that there are some cases in which the testimony of a vocational expert must be used,

> a vocational expert is required only when there are significant and 'sufficiently severe' non-exertional limitations not accounted for in the grid. Clearly, the severity of the limitations at step five that would require use of a vocational expert must be greater than the severity of impairments determined at step two, otherwise the two steps would collapse and a vocational expert would be required in every case in which a step-two determination of severity is made. This would defeat the purpose of the grids because a claimant could not reach the step-five determination without making out a prima facie case of a severe disability at step two.

Hoopai v. Astrue, 499 F.3d 1071 (9th Cir. 2007)(citation omitted).

In this instance, the ALJ determined that there are significant numbers of jobs in the national economy that Claimant can perform without questioning a vocational expert on the subject. The ALJ did not find that Claimant's non-exertional limitations were severe enough to prevent application of the Grid rules, and instead found that GRID Rule 202.00(a) should apply, which states that: "[t]he functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work. Approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy. These jobs can be performed after a short demonstration or within 30 days, and do not require special skills or experience" 20 C.F.R pt. 404, subpt. P, Appendix 2, § 202.00(a). Substantial evidence supports the ALJ's decision to apply with grid rule without vocational expert testimony, including the

evaluations of Dr. Theodore Weber and Dr. Sunitha Pate1. On October 2, 2008 Psychologist Theodore Weber, Psy.D., reviewed Claimant's records at the request of the State Agency and concluded Claimant does not have a severe mental impairment. (Tr. 369-382). He noted that Claimant has mild restrictions of daily living, mild difficulties in maintaining social function, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 379). On January 27, 2009, he again stated that Claimant does not have a severe impairment, and that he has only mild restrictions of daily living, no difficulties in maintaining social function, no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 392-405). Also on January 27, 2009, Sunita Patel, M.D., reviewed Claimant's records and determined that Claimant is able to lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday and was otherwise not limited in his ability to push and pull.  She also determined that Plaintiff could stoop and crouch occasionally. (Tr. 406, 408).  They both found his migraines were not sufficiently severe to bar his ability to work. Accordingly, this Court finds the ALJ did not err in not taking the testimony of a vocational expert.

     3.    <u>Whether the ALJ Failed to Properly Consider Claimant's Obesity and General Anxiety Disorder</u>

Claimant contends the ALJ erred in failing to consider Claimant's obesity as an impairment, either standing alone or in combination with other impairments. (Pl's Mot. Summ. J. 15). More specifically, Claimant argues that Social Security Ruling 02-1p requires ALJs to consider obesity as a medically determinable impairment. <u>Id.</u>

Social Security Ruling 02-01p explains the Administration's policy and protocol on the

evaluation of obesity. "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). The Ruling recognizes Body Mass Index (BMI) as one of the indicia of an individual's degree of obesity. Id. Social Security Ruling 02-1p provides that at step two of the five step evaluation, obesity may be considered alone or in combination with another medically determinable impairment. It further provides that the Administration will do "an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 02-1p[6], 2002 WL 34686281, *4 (Sept. 12, 2002). However, "[e]ven where an ALJ's decision does not explicitly analyze obesity, the omission may be harmless if the ALJ relied on the opinions of doctors who were aware of the obesity." Cook v. Astrue, No. 10C6698, 2011 WL 2708415, at *8 (July 12, 2011)(citing Prochaska v. Barnhart, 454 F.3d 731, 736-37 (7th Cir. 2006)).

Claimant's argument that the ALJ failed to properly consider Claimant's obesity in the ALJ's determination must fail. Here, the ALJ relied on medical evidence that incorporated the effects of Claimant's obesity. For example, the opinion evidence he relied upon came from doctors who either had taken account of Claimant's obesity and did not note it to be a concern, or doctors who did not consider Claimant obese. (Tr. 220, 332). The ALJ also reviewed Claimant's symptoms and daily activities, "which by their nature reflect the combined impact of all Claimant's impairments, including obesity." Cook, 2011 WL 2708415, at *9. The Court also finds it noteworthy Claimant's treating physicians noted Claimant's height and weight but did not document any work preclusive limitations that were attributable to Claimant's obesity (Tr. 220, 332). It is also noteworthy that Claimant significantly reduced his weight from 300 to 265 pounds over the course of the period in question. (Tr. 261, 327, 343). Accordingly, the Court

finds Claimant's argument in this regard deficient.

Finally, Claimant also argues that the ALJ did not properly consider his general anxiety disorder.[6] With regard to Claimant's anxiety, the ALJ found that "[t]he claimant's medically determinable mental impairment of anxiety does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe." (Tr. 17). The ALJ further went on to consider each of the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. He found that because Claimant's medically determinable mental impairment causes no more than a mild limitation in the first three functional areas, and no episodes of decompensation of extended duration in the fourth functional area, it is non-severe. (Tr. 18). The ALJ noted that at Claimant's mental status examination on September 28, 2006, he showed no evidence of thought or mood disorder. (Tr. 23). He also noted that Claimant "has never sought any mental health counseling or treatment and has not alleged any functional impairments based upon his anxiety." (Tr. 23). The ALJ also noted that State Agency mental health consultants completed mental psychiatric review technique assessments of Claimant based upon his allegations of anxiety, but that they concluded his anxiety is a non-severe impairment that does not affect his ability to perform work activities. (Tr. 24). Accordingly, the Court finds the ALJ properly considered Claimant's anxiety.

For the above reasons, Claimant's assertions do not warrant relief.

---

[6]Claimant's Motion for Summary Judgement, besides a brief mention of his anxiety in the section heading of his final claim, fails to address any arguments he may have relating to his anxiety and the ALJ's consideration of this anxiety. See Motion at 15. Despite this deficiency, the Court will address the argument.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED.

2.      Commissioner's Motion for Summary Judgment be GRANTED. The ALJ properly considered whether Claimant suffered from an impairment under 1.04A of the Listing of Impairments, properly determined there are jobs in the national economy that Claimant can perform, and properly handled Claimant's claims of obesity and anxiety.

Any party who appears *pro se* and any counsel of record, as applicable, may, **on or before January 13, 2012** , file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

        DATED: December 30, 2011

                        /s/ *James E. Seibert*
                        JAMES E. SEIBERT
                        UNITED STATES MAGISTRATE JUDGE